Scott E. Davis
State Bar No. 016160
SCOTT E. DAVIS, P.C.
8360 E. Raintree Drive, Suite 140
Scottsdale, AZ 85260

Telephone: (602) 482-4300
Facsimile: (602) 569-9720
email: davis@scottdavispc.com

*Attorney for Plaintiff Jennifer Underwood*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Jennifer Underwood, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | |
| Life Insurance Company of North America; The Vanguard Group, Inc.; The Vanguard Group, Inc. Long-Term Disability Plan, | |
| Defendants. | |

Now comes the Plaintiff, Jennifer Underwood (hereinafter referred to as "Ms. Underwood"), by and through her attorney, Scott E. Davis, and complains against the Defendants as follows:

### *Jurisdiction*

1.      Jurisdiction of the court is based upon the Employee Retirement Income Security Act of 1974 (ERISA); and in particular, 29 U.S.C. §§ 1132(e)(1) and 1132(f). Those provisions give the district courts jurisdiction to hear civil actions brought to recover employee benefits. In addition, this action may be brought before this Court pursuant to 28

U.S.C. § 1331, which gives the Court jurisdiction over actions that arise under the laws of the United States.

### Parties

2.       At all times relevant to this action, Ms. Underwood was a resident of Maricopa County, Arizona.

3.       Upon information and belief, The Vanguard Group, Inc., a Pennsylvania corporation (hereinafter referred to as the "Company"), sponsored, administered and purchased a group long-term disability ("LTD") insurance Policy (hereinafter referred to as the "LTD Policy") which was issued to the Company in the State of Pennsylvania, and is fully insured by Life Insurance Company of North America (hereinafter referred to as "LINA").

4.       The specific LINA group LTD Policy is known as Group Policy No. LK-980241 (the Policy is attached hereto as Exhibit "A").

5.       The Company's purpose in purchasing the LTD Policy was to provide disability insurance and income protection for its employees.

6.       Upon information and belief, the LTD Policy may have been included in and part of an employee benefit plan, specifically named The Vanguard Group, Inc. Long-Term Disability Plan (hereinafter referred to as the "LTD Plan"), which may have been created to provide the Company's employees with welfare benefits.

7.       At all times relevant hereto, the LTD Plan constituted an ERISA "employee welfare benefit plan" as defined by 29 U.S.C. § 1002(1).

8.       Upon information and belief, LINA functioned as the claim administrator of the LTD Policy; however, pursuant to the relevant ERISA regulations, the Company, and/or the LTD Plan may not have made a proper delegation or properly vested fiduciary authority or power in LINA to conduct claim administration.

9.     LINA operated under a structural financial conflict of interest because it fully insured the LTD Policy and made every decision regarding whether Ms. Underwood was disabled and entitled to benefits.

10.     In administering Ms. Underwood's claim, LINA operated under dual and conflicting roles as the decision maker regarding whether Ms. Underwood was disabled, and also the payor of benefits if it found she was disabled.

11.     LINA's structural financial conflict of interest existed and manifested because if it found Ms. Underwood was disabled, it was then financially liable to pay her LTD benefits.

12.     The Company, LINA, and the LTD Plan conduct business within Maricopa County and all events giving rise to this Complaint occurred within Arizona.

### *Venue*

13.     Venue is proper in this district pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391.

### *General Allegations of Common Claims*

14.     Incident to her employment, Ms. Underwood was a covered employee pursuant to the LTD Plan and the relevant LTD Policy, and a "participant" as defined by 29 U.S.C. § 1002(7).

15.     Ms. Underwood seeks disability income benefits in the form of "Any Occupation" LTD benefits from the LTD Plan and relevant LTD Policy pursuant to § 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), as well as any other non-disability employee benefits she may be entitled to from the LTD Plan, from any other Company Plan, and/or from the Company itself as a result of being found disabled in this action.

16.     The standard of review for this Court to apply is *de novo* as the LTD Policy does not contain discretionary language.

17.     After working for the Company as a loyal employee in the occupation of a Retirement Plan Service Representative, on or about January 16, 2017, Ms. Underwood became disabled from working in that occupation, and also disabled from working in any occupation.

18.     Ms. Underwood has remained continuously disabled as that term is defined in the relevant LTD Policy since the day she became disabled, and has not returned to work in any occupation as a result of her serious disabling medical conditions.

19.     Following the onset of her disability, Ms. Underwood filed a claim for short-term disability ("STD") benefits under the Company's self-insured The Vanguard Group, Inc. Short-Term Disability Plan, which was administered, reviewed and approved by an independent entity named Sedgwick Claims Management Services (hereinafter referred to as "Sedgwick").

20.     After reviewing the evidence supporting Ms. Underwood's STD claim, Sedgwick concluded that she met the definition of disability set forth in the STD Plan for the maximum duration of the time those benefits could be paid, which was for one-hundred and twenty (120) days.

21.     Ms. Underwood's STD benefits have been fully paid by the Company and those benefits have been exhausted.

22.     Following the exhaustion of her STD claim/benefits, Ms. Underwood remained disabled from working in any work/occupation and filed a claim for LTD benefits under the relevant LTD Policy.

23.     As referenced, LINA made every decision in Ms. Underwood's LTD claim regarding whether she was disabled pursuant to the terms of the relevant LTD Policy.

24.     Upon information and belief, the relevant LINA LTD Policy's definition of disability governing Ms. Underwood's LTD claim is as follows:

"The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:

1. Unable to perform the material duties of his or her Regular Occupation; and
2. Unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:

1. Unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
2. Unable to earn 80% or more of his or her Indexed Earnings."

25.   In support of her claim for LTD benefits, Ms. Underwood submitted to LINA medical and other evidence which supported her allegation that she met *any* definition of disability set forth in the LTD Policy.

26.   In a letter dated September 28, 2017, LINA informed Ms. Underwood it was denying her claim for LTD benefits based on its finding that she did not meet the "Regular Occupation" definition of disability set forth in the LTD Policy.

27.   Ms. Underwood alleges that LINA's denial of her claim for LTD benefits after nothing had improved or changed in her disabling medical conditions since she exhausted her STD benefits was motivated by its financial conflict of interest and desire to save money by not paying her LTD benefits.

28.   As part of its review which led to the denial of Ms. Underwood's LTD claim/benefits, LINA obtained a medical records only "paper review" (meaning the consultant ***never*** spoke to, saw or physically examined Ms. Underwood) from its own employee, Associate Medical Director, Anthony Watson, M.D.

29.   Due to his employment relationship with LINA, Ms. Underwood alleges that Dr. Watson is biased and operated under his own conflicts of interest given his status as LINA's employee which motivated him to favor LINA in his opinions.

30.     Due to his conflicts of interest, Dr. Watson had an incentive to protect his employment with LINA by providing medical records only "paper reviews" where he selectively reviewed, ignored, and de-emphasized the evidence which proved that Ms. Underwood was disabled and entitled to benefits.

31.     Ms. Underwood alleges Dr. Watson's conflict of interest referenced herein led him to render opinions which favored LINA so it could use them to support its determination that Ms. Underwood was not disabled.

32.     Dr. Watson's employment status, bias, and conflicts of interest in his relationship to LINA are the reasons he ultimately rendered opinions which favored LINA and were adverse to Ms. Underwood and her claim.

33.     LINA's structural financial conflict of interest and desire to save money led it to accept and base its unlawful and erroneous decision to deny Ms. Underwood's claim on Dr. Watson's biased, one-sided report and opinions.

34.     Pursuant to 29 U.S.C. §1133, Ms. Underwood timely appealed LINA's September 28, 2017 denial of her LTD claim/benefits and submitted additional medical documentation supporting her appeal and her allegation she is disabled and entitled to benefits as she meets any definition of disability in the LTD Policy.

35.     In support of her LTD claim, Ms. Underwood submitted to LINA a July 11, 2018 narrative letter authored by her board-certified treating physician who opined Ms. Underwood is totally disabled in stating, "It is of my opinion and I do believe Mrs. Underwood has been unable to work in her prior occupation or any occupation since January 2017."

36.     Ms. Underwood also submitted a Functional Capacity Evaluation report dated March 16, 2018, wherein after an extensive approximately three (3) hour interview, clinical physical examination and simulated objective workplace testing which produced ***valid*** test results, the qualified physical therapist concluded, "…[Ms. Underwood] is UNABLE to

perform the physical demands or material duties of ANY work including SEDENTARY work on a regular and consistent basis." (original emphasis).

37.     Further supporting her LTD claim, Ms. Underwood submitted a Vocational Assessment (evaluation) dated May 23, 2018 from a certified vocational expert, who after personally interviewing Ms. Underwood to understand the material duties of her occupation and reviewing relevant evidence in Ms. Underwood's claim regarding her functional limitations, along with the definition of disability set forth in the LTD Policy, concluded, "…it is my professional opinion to a reasonable degree of vocational probability that Ms. Jennifer Underwood is totally disabled from working in her occupation and any occupation..."

38.     Ms. Underwood also submitted her May 19, 2018 sworn affidavit wherein she confirmed she remained unable to work in any occupation and that her disabling medical conditions had not improved since she last worked on January 16, 2017.

39.     Ms. Underwood also submitted a May 19, 2018 sworn affidavit from her husband, who confirmed she is unable to engage in any work/occupation and her disabling medical conditions have not improved in any meaningful way since the date she originally became disabled as set forth herein.

40.     Ms. Underwood also submitted a March 22, 2018 sworn affidavit from her long-time friend, who also opined she is unable to engage in any work/occupation and her disabling medical conditions have not improved in any meaningful way since the date she originally became disabled.

41.     Ms. Underwood also submitted updated medical records from her treating medical professionals which confirmed that she remained disabled as the term is defined in LINA's LTD Policy, as well as the fact and that her disabling medical conditions have not improved since she became disabled and last worked.

42.     Ms. Underwood also submitted a list of her current medications, along with the adverse side effects/limitations they create for her and the reasons they preclude her from being able to work in any occupation.

43.     LINA has a long history, pattern and practice of engaging in conflicted, self-dealing, self-interested and parsimonious claims handling by rendering decisions that favor LINA, as documented in the Regulatory Settlement Agreement ("RSA") it voluntarily entered into with essentially every State in the country, including the Arizona Department of Insurance on June 11, 2013 (the RSA is attached as Exhibit "B" to this Complaint).

44.     On May 22, 2018, Ms. Underwood reminded LINA of the RSA and its legal duties pursuant to the agreement as it relates to administering her claim consistent with the terms of the RSA by submitting a copy to LINA during its review of her LTD claim.

45.     The RSA resulted from a multistate examination of LINA's disability claims practices which led to many regulatory concerns and a corrective action plan LINA agreed to.

46.     The corrective action plan included oversight and regulatory monitoring of LINA by governmental agencies in its disability claims management and administration,

47.     Ms. Underwood's LTD claim is covered by the RSA and must be administered in accordance with the agreement's requirements.

48.     Whether LINA complied with the terms of the RSA in its review of Ms. Underwood's LTD claim by reviewing and administering it in a manner consistent with the RSA's requirements is relevant evidence in her claim.

49.     As part of the terms of the RSA, LINA agreed to pay $925,000 in fines to the participating state regulatory agencies.

50.     As part of terms of the RSA, LINA agreed to collectively pay 5 different states' regulatory agencies hundreds of thousands of dollars for ongoing claims monitoring.

51.    Ms. Underwood alleges that LINA's review of her disability claim not only failed to comply with ERISA regulations, but also the terms of the RSA.  LINA's review violated the terms of the RSA and its actions also precluded a "full and fair review" pursuant to ERISA.

52.    Although the standard of review should be *de novo* for reasons set forth herein, regardless of the standard of review, Ms. Underwood is entitled to discovery regarding LINA's compliance with the terms of the RSA during its review and decision making in Ms. Underwood's claim.

53.    All of the reliable evidence Ms. Underwood submitted to LINA conclusively proves she is unable to work in *any occupation* and that she has consistently met and continues to meet the "Any Occupation" definition of disability set forth in the LTD Policy.

54.    As part of its review of Ms. Underwood's LTD claim, LINA obtained a medical records only "paper review" from a doctor named Gregory Smith, M.D.

55.    Gregory Smith, M.D. was retained by LINA through a hired third-party vendor named Dane Street.

56.    Dane Street is a biased company who operated under a conflict of interest in Ms. Underwood's claim due to its long, extensive business relationship with the disability insurance industry and history of providing biased medical records reviews from so called "independent" doctors like Dr. Smith.

57.    Upon information and belief, Dr. Smith's bias in evident due to the fact she repeatedly renders opinions and reports which favor disability insurance companies such as LINA and disfavor insureds such as Ms. Underwood.

58.    On similar facts as the instant case, the Court in *Hertz v. Hartford Life & Accident Ins. Co.*, 991 F. Supp 2d 1121, 1136 (D. Nev 2014), reversed the denial of an ERISA disability claim made by a conflicted insurance company (like LINA) after it reviewed discovery answers related to alleged conflicts of interest and bias involving the

business relationship between the disability insurance company **_and_** its retained third-party vendor retained to find an alleged "independent" doctor to review only Hertz's medical records (*See* Exhibit "C" for *Hertz* decision).

59.     Discovery responses in *Hertz* revealed that **_95%_** of the time in ERISA disability claims, the third-party vendor and its retained, "independent" medical records reviewing doctor opined that a claimant **_was not disabled and was able to work._**

60.     *Hertz* specifically referenced the third-party vendor and its retained doctor's conflicts of interests and bias in its Order:

> "Accordingly, **MLS** [i.e. third-party vendor] **_found that approximately 95% of all claimants could perform some type of work._**

> During that same time frame, Dr. Rim reviewed fourteen (14) claims for Hartford…Significantly, of those fourteen (14) claims reviewed, **_Dr. Rim did not find that a single claimant was completely unable to perform any type of work._**

> Accordingly, Dr. Rim found that 100% of all claimants could perform some type of work.

> **_The Court finds these statistics strongly suggest that both MLS and Dr. Rim harbored a significant bias towards finding a claimant capable of performing some type of work_**.

> *See also Montour*, 588 F.3d at 634 (noting relevance of statistics regarding Hartford's rate of claims denials or how frequently it contracts with the file reviewers it employed in that case to the issue of bias)." (emphasis added).

61.     Similar to Dr. Rim's involvement in *Hertz,* Ms. Underwood alleges Dr. Smith is not an "independent" medical reviewer as LINA and Dane Street allege. Rather, he is instead a biased, long-time medical consultant who is repeatedly retained by Dane Street, as well as other third-party vendors and disability insurance companies such as LINA.

62.     Due to his long-time relationship with LINA, Dane Street and/or the disability insurance industry, Dr. Smith is biased and operated under his own conflicts of interests in the review of Ms. Underwood's claim.

63.    Dr. Smith's bias and conflicts of interest led to his selective, one-sided and biased review of Ms. Underwood's evidence and is the reason he deliberately and blatantly de-emphasized and minimized her evidence of disability in order to render an opinion that Ms. Underwood was not disabled so he could favor LINA and the vendor who retained him.

64.    Dr. Smith's bias, conflicts of interest and relationships with the disability insurance industry, including the third-party vendor who retained him, are the reasons he rendered an opinion that is adverse to Ms. Underwood and her claim.

65.    Due to his bias and conflicts of interest, Dr. Smith has an incentive to protect his own consulting relationships with LINA, Dane Street and/or the disability insurance industry by providing medical records only "paper reviews," where he selectively reviews, ignores, and de-emphasizes evidence that proves Ms. Underwood is disabled and entitled to benefits.

66.    Dr. Smith's opinions in Ms. Underwood's claim were motivated by his conflict of interest which led him to favor LINA so it could use his report to conclude she did not have any limitations due to her medical conditions that preclude her from working.

67.    In a letter dated August 3, 2018, LINA informed Ms. Underwood it was denying the appeal of her claim for LTD benefits after using Dr. Smith's opinions to support its erroneous and unreasonable conclusion that, "…the available medical information did evidence a severity of symptoms to support medically necessary activity restrictions. However, the restrictions identified were determined to be consistent with the functional demands of Ms. Underwood's own occupation."

68.    LINA's denial of Ms. Underwood's claim based on Dr. Smith's biased opinions as set forth in his medical records only "paper review" is an ERISA procedural violation because in accepting his opinions, among other procedural violations, LINA failed to act as her fiduciary and failed to provide a "full and fair" review.

69.     Pursuant to 29 U.S.C. §1133, Ms. Underwood timely appealed LINA's August 3, 2018 denial of her LTD claim/benefits and submitted additional medical and other evidence in support of her appeal and allegation that she is disabled and meets any definition of disability in the LTD Policy.

70.     Ms. Underwood also submitted another copy of the RSA for LINA's review.

71.     In support of her appeal, Ms. Underwood submitted to LINA a September 10, 2018 narrative letter authored by a board-certified surgeon who previously treated her for two (2) years and confirmed, "…due to her medical condition, [Ms. Underwood] has been unable to work since January 2017 and it remains my medical opinion that Ms. Underwood is currently unable to work in any occupation on a full-time basis and I believe this will be the case indefinitely."

72.     Further supporting her LTD claim and appeal, Ms. Underwood submitted a *second* Vocational Assessment (evaluation) dated March 14, 2019 from the same certified vocational expert who authored the May 23, 2018 assessment (¶ 37) and concluded, "after reviewing Dr. Smith's peer review reports, along with the narrative report of [Ms. Underwood's board-certified surgeon] and the affidavit of Ms. Underwood, it continues to be, and strengthens, my vocational opinion Ms. Underwood is totally disabled from working in her occupation and any occupation."

73.     Ms. Underwood also submitted her February 8, 2019 sworn affidavit wherein she confirmed, "due to the conditions, pain, and my limitations as explained in both my previous affidavit dated May 19, 2018 and this affidavit, I am unable to work in any occupation at the present time and have been unable since January 16, 2017."

74.     Ms. Underwood also submitted updated medical records from her treating medical professionals which confirmed she remained disabled as that term is defined in LINA's LTD Policy and that her disabling medical conditions had not improved since she became disabled and last worked.

-12-

75.     Ms. Underwood also submitted a list of her current medications and the adverse side effects/limitations they create and why they continued to preclude her from working in any occupation.

76.     All of the reliable evidence Ms. Underwood submitted to LINA again proved she is unable to work in *any occupation* and that she met and continues to meet the "Any Occupation" definition of disability set forth in the LTD Policy.

77.     As part of its review of Ms. Underwood's LTD claim, LINA obtained two (2) medical records only "paper reviews" from two (2) doctors named Donald D. Getz, M.D. and Patrick R. McKenna, D.O.

78.     Donald D. Getz, M.D. and Patrick R. McKenna, D.O. were retained by LINA through its third-party vendor named Managing Care. Managing Costs. (hereinafter referred to as "MCMC").

79.     In his April 19, 2019 report, Dr. McKenna confirmed it was his medical opinion that, "based on the provided records, [Ms. Underwood] is physically functionally limited for the time period 01/16/2017 to present."

80.     In his April 29, 2019 report, Dr. Getz confirmed it was his opinion that, "based on the provided records, the claimant does require medically necessary work activity restrictions from 01/16/2017 to the present."

81.     LINA did not disclose Drs. McKenna and Getz's reports to Ms. Underwood until September 9, 2019, a date which followed LINA's approval and subsequent termination of her claim/benefits, as addressed below.

82.     In a letter dated April 23, 2019, LINA provided Ms. Underwood with one (1) question posed by Dr. Getz to her board-certified surgeon who authored the September 10, 2018 narrative letter (¶ 71) which supported her claim.

83.     In a four (4) page letter dated May 15, 2019, Ms. Underwood's counsel responded to LINA's April 23, 2019 letter responding to Dr. Getz's question and detailing the numerous reasons she is unable to work in any occupation.

84.     In her May 15, 2019 letter, Ms. Underwood informed LINA that her board-certified surgeon who authored the narrative letter supporting her claim had "discharged Ms. Underwood from his care in March 2018 as there was nothing more he could offer in terms of orthopedic treatment."

85.     In her May 15, 2019 letter, Ms. Underwood also requested for LINA to "provide [her] with a complete copy of Dr. Getz's report, prior to a decision being made on her claim so her treating and evaluating medical professionals have an opportunity to review and respond to it."

86.     During a May 21, 2019 telephone call between undersigned counsel's paralegal, Mrs. Christensen, and LINA representative, Ms. Fallon K., Ms. Fallon K. informed Ms. Christensen that LINA would not provide Ms. Underwood with a complete copy of Dr. Getz's report as requested.

87.     In a letter dated June 18, 2019, Ms. Underwood reminded LINA it was required pursuant to ERISA and Ninth Circuit law to engage her in a "meaningful dialogue" as part of a "full and fair" review. *See Salomaa v. Honda Long Term Disability Plan*, 637 F.3d 958, 972 (9th Cir. 2011) and *Montour v. Hartford Life & Accident Inc. Co.,* 588 F.3d 623 (9th Cir. 2009).

88.     At the time it received Ms. Underwood's June 18, 2019 letter, LINA was well aware of its duty to engage her in a "meaningful dialogue" regarding her claim because it was the insurance company's whose denial of a disability claim was rejected because the Ninth Circuit found it failed to engage in this dialogue in *Salomaa.*

89.     In a letter dated June 27, 2019, LINA informed Ms. Underwood it was approving her claim for LTD benefits.

90.     LINA approved Ms. Underwood's LTD claim and paid disability benefits from May 16, 2017 through July 14, 2019, when it terminated them without any credible medical or other evidence to support its allegation that her disabling medical conditions had improved in a way that allowed her to return to work.

91.     Only ***one month*** after LINA found Ms. Underwood was disabled and approved her claim, in a letter dated July 25, 2019 it informed her that her LTD benefits were terminated beyond July 14, 2019 because it no longer found she met the "Any Occupation" definition of disability its LTD Policy.

92.     LINA's July 25, 2019 termination of benefits letter violated ERISA's notice requirement (See 29 C.F.R. § 2560.503(1)(g)(1)(iii)) and *Montour,* 588 F.3d 623, 636, because it failed to inform Ms. Underwood what was necessary to perfect her appeal:

> We have also construed this regulation to require a plan administrator denying benefits in the first instance to notify the claimant not just of the opportunity for internal agency review of that decision but also of what additional information would be necessary "to perfect the claim[.]"

93.     LINA informed Ms. Underwood in its July 25, 2019 letter that as part of its review to determine whether she continued to meet the "Any Occupation" definition of disability in the LTD Policy, it "reviewed the peer reviews conducted by Dr. McKenna and Dr. Getz on April 29, 2019…[and] based on the supported restrictions, it was determined that you could perform Sedentary Work in other capacities."

94.     Pursuant to 29 U.S.C. §1133, Ms. Underwood timely appealed LINA's July 25, 2019 termination of her LTD claim/benefits.

95.     In support of her LTD claim and appeal, Ms. Underwood informed LINA she disagreed with the denial and submitted additional reliable, credible, compelling medical and other evidence which supported her allegations she is disabled and that she meets the "Any Occupation" definition of disability in the LTD Policy.

96.     Ms. Underwood submitted a March 25, 2020 narrative letter authored by her board-certified treating physician of over twenty (20) years, who confirmed, "…I do believe that [Ms. Underwood] has been unable to work in her prior occupation or any occupation since January 2017 and this will be indefinite in Ms. Underwood's case…"

97.     Further supporting her LTD claim, Ms. Underwood submitted a *third* Vocational Assessment (evaluation) dated April 3, 2020 from the same certified vocational expert who authored the May 23, 2018 and March 14, 2019 assessments (¶¶ 37, 72). After personally interviewing Ms. Underwood again and reviewing relevant evidence he opined, "…it remains my professional opinion, to a reasonable degree of vocational probability, that Ms. Jennifer Underwood is totally disabled from a physical and cognitive perspective due to severe and chronic medical conditions."

98.     Ms. Underwood also submitted her *third* sworn affidavit dated January 13, 2020 wherein she confirmed that, "Due to my severe and disabling medical conditions, pain, and my limitations as explained in this affidavit, I am unable to work in any occupation at the present time and have been unable since January 16, 2017."

99.     Ms. Underwood also submitted to LINA a *second* sworn affidavit dated January 16, 2020 from her husband who again confirmed that she remained unable to work in any occupation and her disabling medical conditions had not improved since she originally became disabled.

100.    Ms. Underwood also submitted updated medical records from her treating medical professionals which confirmed she remained disabled as that term is defined in LINA's LTD Policy and her disabling medical conditions had not improved.

101.    Ms. Underwood also submitted a list of her current medications, along with the adverse side effects/limitations they create and why they preclude her from working in any work/occupation.

102.   On January 16, 2020, Ms. Underwood again reminded LINA of its legal obligations under the RSA by submitting a third copy to LINA.

103.   As part of its review of Ms. Underwood's claim, LINA obtained two (2) medical records reviews from *two (2) of its own* reviewing medical professionals, employees David P. Yuppa, M.D. and Lisa Anderson, M.D., and a Transferable Skills Analysis from one of its vocational employees, Ms. Nicole Surmacy.

104.   Due to their employment relationships with LINA, Drs. Yuppa, Anderson and Ms. Surmacy are biased and motivated by their own conflicts of interest.

105.   Due to their conflicts of interest, Drs. Yuppa and Anderson have incentives to protect their own consulting relationships and employment with LINA by providing medical records only "paper reviews" where they selectively review, ignore, and de-emphasize evidence, as occurred in Ms. Underwood's claim in order to provide opinions and reports favoring LINA so it had a reason to continue to deny her claim.

106.   Due to her conflicts of interest, Ms. Surmacy has an incentive to protect her own employment with LINA by providing Transferrable Skills Analyses which favor LINA by ignoring the evidence which supported Ms. Underwood's claim and should have led to LINA finding she is disabled and unable to work in any occupation.

107.   Drs. Yuppa, Anderson and Ms. Surmacy's bias, conflicts of interest and employment with LINA are the reasons they rendered opinions which favored LINA and were adverse to Ms. Underwood and her claim.

108.   LINA's structural financial conflict of interest and desire to save money led it to accept and base its unlawful and erroneous decision to deny Ms. Underwood's claim on Drs. Yuppa, Anderson and Ms. Surmacy's biased, one-sided reports and opinions that Ms. Underwood was not precluded from working in any occupation, which favored and only considered LINA's interests.

109.    In a letter dated June 30, 2020, LINA provided Ms. Underwood with Drs. Yuppa and Anderson's reports and Ms. Surmacy's Transferrable Skills Analysis and asked her to "respond" if she desired.

110.    In her April 29, 2020 "Specialist Review," Dr. Anderson opined that "while the…file supports restrictions and limitations…it does not support complete inability to function or total disability."

111.    The restrictions and limitations Dr. Anderson set forth in her report confirm Ms. Underwood was not able to work in any occupation, but her bias and conflicts of interest are evident in the fact that in spite of those restrictions and limitations, she opined Ms. Underwood was not precluded from working in any occupation.

112.    Dr. Anderson opining Ms. Underwood was not precluded from working in any occupation in spite of the restrictions and limitations she set forth in her report means she either did not understand they did not allow Ms. Underwood to do any work, or worse, she understood this but intentionally misrepresented that Ms. Underwood was able to work even though her restrictions and limitations did not allow it.

113.    In a four (4) page letter dated July 10, 2020, Ms. Underwood informed LINA that "after reviewing the reports…and Transferable Skills Analysis (TSA)…no response from Ms. Underwood should be necessary and the claim should be approved.  It is clear Cigna's own doctor, Dr. Anderson, set forth work limitations that do not allow Ms. Underwood to perform any work, including *Sedentary* work as defined by the *Dictionary of Occupational Titles* (DOT)." (original emphasis).

114.    In her July 10, 2020 letter, Ms. Underwood reminded LINA of its "...ERISA fiduciary duty to administer the claim 'solely' in Ms. Underwood's best interest.  This ***duty*** required [LINA] to ***immediately accept and adopt*** Dr. Anderson's opinions and approve the claim…Dr. Anderson has rendered her opinions and set forth limitations that do not allow any work." (original emphasis).

-18-

115.   In a letter dated July 17, 2020, LINA informed Ms. Underwood it was denying the appeal of her claim after erroneously and unreasonably concluding, "…a total functional impairment was not clinically supported."

116.   In its final denial dated July 17, 2020, LINA notified Ms. Underwood she had exhausted all of is administrative reviews in her LTD claim and she could file a civil action lawsuit in federal court pursuant to ERISA.

117.   In a four (4) page letter dated November 5, 2020, in asking LINA to act as her ERISA fiduciary by overturning the denial of her claim, Ms. Underwood responded to the many inaccuracies in LINA's July 17, 2020 final denial and again reminded LINA that "[its] own retained doctor, Dr. Lisa Anderson, set forth work limitations in her April 29, 2020 medical records only review report that ***do not allow Ms. Underwood to perform any work***, including *Sedentary* work as defined in the *Dictionary of Occupational Titles* (DOT)." (original emphasis).

118.   In her November 5, 2020 letter, Ms. Underwood requested for LINA to reopen her disability claim to provide her with the "full and fair" review she was entitled to under ERISA. Ms. Underwood requested for LINA to fulfill its duties to her by accepting additional credible and reliable evidence that she submitted (addressed below) and to make this evidence part of the Administrative Record (i.e. claim file).

119.   Ms. Underwood informed LINA in her November 5, 2020 letter it "violated its ERISA fiduciary duties to [her] and Ninth Circuit law in *Salomaa* by denying her claim without engaging her in the required good faith meaningful dialogue."

120.   In her letter dated November 5, 2020, Ms. Underwood informed LINA that *Metro. Life Ins. Co., v. Glenn,* 554 U.S. 105, 115 (2008) holds it to a high standard in the administration of her claim:

> ERISA imposes higher-than-marketplace quality on standards on insureds. It sets forth a special standard of care upon a plan administrator, namely, that the administrator "discharge [its] duties" in respect to discretionary claims processing

-19-

"solely in the interests of the participants and beneficiaries" of the plan, § 1104(a)(1)…

121.   The evidence submitted by Ms. Underwood with her November 5, 2020 letter would have ***all*** been in LINA's Administrative Record (i.e. claim file) at the time of its submission if LINA had complied with ERISA's regulations and afforded her a "full and fair" review.

122.   The evidence submitted by Ms. Underwood with her November 5, 2020 letter would have ***all*** been in LINA's Administrative Record (i.e. claim file) at the time of its submission, but for LINA's failure to act as her ERISA fiduciary and failure to investigate and administer the claim "solely in her best interests" as required by 29 U.S.C. § 1104(a).

123.   With her November 5, 2020 letter, Ms. Underwood submitted to LINA a *fourth* Vocational Assessment (evaluation) dated September 3, 2020, from the same vocational expert who authored the prior reports (*See* ¶¶ 37, 72, 97), and after reviewing Ms. Surmacy's June 22, 2020 Transferrable Skills Analysis ("TSA") he opined, "Cigna's TSA report is seriously flawed and vocationally irrelevant as it relates to Ms. Underwood's personal situation and ability to work."

124.   Ms. Underwood's vocational expert further confirmed that, "…based on Dr. Anderson's sitting restriction alone and the definition of "Sedentary work" per the [Dictionary of Occupational Titles], Ms. Surmacy should have determined Ms. Underwood does not meet the physical requirements for performing Sedentary work in any occupation."

125.   In his September 3, 2020 assessment, Ms. Underwood's vocational expert reiterated his opinion that the evidence in the claim file/Administrative Record proves she is unable to work in any occupation and she met and continues to meet the "Any Occupation" definition of disability set forth in the LTD Policy.

126.   Ms. Underwood also submitted a four (4) page affidavit dated October 23, 2020, where she corrected many erroneous statements made by Ms. Surmacy in her analysis and Dr. Anderson's report which were the basis of LINA's July 17, 2020 final denial.

127.    Ms. Underwood also submitted a *fourth* copy of the RSA to LINA with her November 5, 2020 letter.

128.    In a letter dated December 24, 2020, LINA informed Ms. Underwood that, "…we received and *reviewed* the vocational opinion dated September 3, 2020, it does not change our decision.   In addition, we previously advised that you have exhausted all administrative levels of appeal and no further appeals will be considered."

129.    LINA's December 24, 2020 letter acknowledges that the evidence submitted by Ms. Underwood on November 5, 2020 was reviewed in consideration of her claim and is therefore part of the Administrative Record (i.e., claim file).

130.    LINA's structural conflict of interest led it to unlawfully accept and rely on Dr. Yuppa and Ms. Surmacy's biased opinions that Ms. Underwood was not precluded from working in any occupation.

131.    LINA's structural conflict of interest led it to unlawfully accept and rely on Dr. Anderson's biased opinion that Ms. Underwood was not precluded from working in any occupation, which was contrary to the restrictions and limitations she set forth in her report.

132.    The biased, selective, cherry-picked and unfavorable opinions that Ms. Underwood was not precluded from working in any occupation by Drs. Yuppa and Anderson were motivated by and directly resulted from their conflicts of interest as referenced herein and their desire to protect their consulting relationships and employment with LINA.

133.    During its reviews, LINA violated ERISA in failing to engage Ms. Underwood in a meaningful dialogue which led to it not obtaining a complete or accurate picture of her disabling diagnoses/medical conditions or the symptoms and limitations which result and do not allow her to work in any occupation.

134.    If LINA had complied with ERISA and Ninth Circuit law during its review by engaging Ms. Underwood in a meaningful dialogue regarding the deficiencies in her claim

that were the basis of its denials, she and her treating/evaluating medical and other professionals would have had an opportunity to respond to LINA and perfect the record so her claim would have been approved rather than denied.

135.   As set forth by LINA in its July 17, 2020 final denial, the reasons and deficiencies it alleged existed in Ms. Underwood's evidence/claim are not inconsequential, they are the reasons *LINA* denied her claim.

136.   All the reliable evidence Ms. Underwood submitted to LINA proves she is unable to engage in any work/occupation, and that she met and continues to meet the "Any Occupation" definition of disability set forth in the LTD Policy.

137.   During its review, LINA either negligently or intentionally committed numerous ERISA procedural violations identified herein which directly led to the unlawful denial of Ms. Underwood's LTD claim.

138.   LINA's ERISA procedural violations include, but are not limited to, completely failing to credit, reference, consider, and/or selectively reviewing and de-emphasizing all of Ms. Underwood's reliable evidence which proves she met and continues to meet the "Any Occupation" definition of disability in the LTD Policy.

139.   In evaluating and denying Ms. Underwood's LTD claim, LINA failed to fulfill its fiduciary duty to her because it did not administer it, "solely in [her] best interests and other participants." [1]   *See* 29 C.F.R. § 1104(a).

---

[1] It sets forth a special standard of care upon a plan administrator, namely, that the administrator "discharge [its] duties" in respect to discretionary claims processing "solely in the interests of the participants and beneficiaries" of the plan, § 1104(a)(1); it simultaneously underscores the particular importance of accurate claims processing by insisting that administrators "provide a 'full and fair review' of claim denials," Firestone, 489 U.S., at 113, 109 S. Ct. 948, 103 L. Ed. 2d 80 (quoting § 1133(2)); and it supplements marketplace and regulatory controls with judicial review of individual claim denials, see § 1132(a)(1)(B). *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2350 (U.S. 2008).

140.   LINA failed to adequately investigate Ms. Underwood's claim and failed to engage her in a meaningful dialogue during the appeal of her claim with regard to what evidence was necessary so Ms. Underwood could perfect her claim/appeal.  LINA's failure to engage her in a dialogue precluded her from the opportunity to prove and perfect her claim.

141.   Ms. Underwood alleges LINA's review was neither full nor fair and violated ERISA, specifically, 29 U.S.C. § 2560.503-1, and failed to comply with the terms of its own LTD Policy and the RSA for numerous reasons including but not limited to: failing to meet ERISA's notice requirements by informing Ms. Underwood in its denial letters what was necessary for her perfect her claim/appeal; by failing to credit Ms. Underwood's credible, reliable evidence; by abdicating and outsourcing its ERISA fiduciary duty when it retained biased third-party vendors/companies (Dane Street) who in turn retained biased medical consultants (Dr. Smith) to review only Ms. Underwood's medical records and render opinions in her claim; by failing to have Ms. Underwood's claim reviewed by a truly independent third-party vendor and independent medical consultant; by de-emphasizing, cherry picking and selectively reviewing Ms. Underwood's evidence in an effort to terminate and deny LTD benefits when all her evidence proved that she met and continues to meet the "Any Occupation" definition of disability in the LTD Policy; by providing biased and one-sided reviews of Ms. Underwood's LTD claim that failed to consider all of the evidence submitted by her and/or by de-emphasizing medical and other evidence which supported Ms. Underwood's claim and its approval; by disregarding and/or failing to consider Ms. Underwood's disabling subjective and self-reported complaints/symptoms and limitations; by failing to consider the *combined and aggregate effect* that all of her disabling medical conditions and resulting limitations documented in her evidence had and have on her ability to work in any occupation; by failing to engage Ms. Underwood in a "meaningful dialogue" so she, her treating and/or evaluating medical/vocational professionals were able to *adequately* respond to LINA's reviewing medical/vocational consultants/professionals' (Drs.

Watson, Smith, Getz, McKenna, Yuppa, Anderson and Ms. Surmacy) reports; by precluding Ms. Underwood from being able to submit the necessary evidence to perfect her LTD claim so it could be approved; and by failing to consider the adverse impact the side effects Ms. Underwood's medications have had, and continue to have on her ability to engage in any work/occupation.

142.    The procedural violations set forth above precluded LINA not only from providing a "full and fair" review, but also led it to erroneously conclude that Ms. Underwood was not disabled and entitled to LTD benefits.

143.    If after review, the Court is unable to determine whether Ms. Underwood meets the relevant definition of disability and is entitled to LTD benefits, the case should be remanded to LINA so it can remedy its procedural violations consistent with the Court's Order by providing the "full and fair" review required by ERISA and federal law. *See* 29 C.F.R. § 2560.503-1.

144.    Ms. Underwood alleges one reason LINA provided an unlawful review that was neither full nor fair and that violated ERISA, specifically, 29 U.S.C. § 2560.503-1, is due to its financial conflict of interest which manifested as a result of LINA's roles as the decision maker and payor of benefits.

145.    LINA's conflict of interest provided it with a financial incentive to deny Ms. Underwood's LTD claim, because every dollar it saved by not paying Ms. Underwood's LTD claim has resulted in a profit for LINA.

146.    In *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003), the Supreme Court warned about biased, conflicted insurance company retained doctors, such as Dr. Smith, who are repeatedly retained by disability insurance companies and/or third-party vendors, such as Dane Street, to review disability claims by noting, "Nor do we question the Court of Appeals' concern that physicians retained by benefits plans may have

an 'incentive to make a finding of not disabled' in order to save their employers money and to preserve their own consulting arrangements."

147.    LINA's blatant self-serving actions are similar to ***its own*** conflicted and unlawful review laid bare by the Ninth Circuit in *Salomaa,* 642 F.3d 666, 680, where it was criticized as being a company with a "conflict of interests [who] also has a financial incentive to cheat."

148.    LINA unlawfully cheated Ms. Underwood out of her benefits in the same manner that it cheated Mr. Salomaa out of his benefits.

149.    The facts and Court's holding in *Salomaa* are highly relevant evidence of LINA's long history of self-dealing, its parsimonious and one-sided claims handling which favors only LINA.

150.    LINA's long history of conflicted, parsimonious claims handling must be considered by this Court in weighing LINA's conflict of interest and those of any entity and/or individual involved in the review of Ms. Underwood's claim.

151.    Ms. Underwood asserts that any third-party vendor retained by LINA, and in turn, any medical professional hired by a third-party vendor to review evidence in Ms. Underwood's claim, operated under a conflict of interest due to their extensive business relationship with LINA and their relationship with the disability insurance industry in general.

152.    The standard of review for this Court to apply is *de novo* as the LINA LTD Policy does not contain discretionary language.

153.    The Court will review the evidence and make a *de novo* determination as to whether Ms. Underwood met and continues to meet the "Any Occupation" definition of disability set forth in the LTD Policy.

154.    In denying Ms. Underwood's claim, LINA failed to provide a "full and fair" review pursuant to ERISA and its denial of her LTD claim is a *de novo* wrong decision,

because her evidence proves she met and continues to meet the "Any Occupation" definition of disability set forth in the LTD Policy.

155. Even if the Court concludes LINA's Policy confers discretion, the standard of review should be *de novo* because LINA's numerous ERISA procedural and other violations as set forth herein are so egregious they warrant *de novo* review.

156. In the event the Court determines the standard of review is discretionary, LINA abused its discretion in terminating Ms. Underwood's benefits and claim.

157. Regardless of the standard of review, discretionary or *de novo*, Ms. Underwood is entitled to discovery regarding LINA's aforementioned conflicts of interest, its bias and business relationships referenced herein, as well as the conflicts of interest of any third-party vendor(s)(including but not limited to Dane Street) hired by LINA and any medical/vocational consultant/professional (including but not limited to Drs. Watson, Smith, Yuppa, Anderson and Ms. Surmacy) LINA employed or retained to be involved in its review of Ms. Underwood's LTD claim.

158. Regardless of the standard of review, the Court should permit discovery so it can properly weigh and consider the nature, extent and effect that *any conflict of interest* and/or any ERISA procedural violation had on LINA's decision to terminate and deny Ms. Underwood's claim/benefits.

159. Regardless of the standard of review, Ms. Underwood is entitled to discovery regarding LINA's compliance with the terms of its LTD Policy, the LTD Plan and its RSA, as well as the numerous ERISA procedural violations it committed during its review of Ms. Underwood's claim.

160. As a direct result of LINA's decision to terminate and deny Ms. Underwood's disability claim, she has been substantially injured and suffered damages in the form of lost LTD benefits, in addition to other potential non-disability employee benefits she may be

entitled to receive through or from the Plan, from any other Company Plan and/or the Company as a result of being found disabled in this matter.

161.    Upon information and belief, Ms. Underwood alleges other potential non-disability employee benefits may include but not be limited to, health insurance benefits and coverage, and other insurance related coverage or benefits, retirement benefits or a pension, life insurance coverage and the waiver of the premium on a life insurance policy which may provide coverage for her and her family/dependents.

162.    Ms. Underwood seeks any and all employee benefits, including but not limited to disability benefits and any other benefits she may be entitled to and due from the Defendants as a result of being found disabled in this matter.

163.    Pursuant to 29 U.S.C. § 1132, Ms. Underwood is entitled to recover unpaid disability and non-disability employee benefits, prejudgment interest, reasonable attorneys' fees and costs from Defendants.

164.    Ms. Underwood is entitled to prejudgment interest at the legal rate pursuant to A.R.S. § 20-462, or at such other rate as is appropriate to compensate her for the losses she has incurred as a result of Defendant's nonpayment of benefits.

WHEREFORE, Ms. Underwood prays for judgment as follows:

A.    For an Order finding the evidence in her LTD claim is sufficient to prove she met and continues to meet the "Any Occupation" definition of disability set forth in the relevant LTD Plan and/or LTD Policy, and she is entitled to LTD benefits, and any other non-disability employee benefits as a result of that Order, from the date she was first entitled to these benefits but denied them, through the date of judgment with prejudgment interest thereon;

B.    For an Order directing Defendant to continue paying Ms. Underwood the aforementioned LTD benefits until such time as she meets the conditions for the termination of benefits;

C.      In the event the Court is unable to render a decision as to whether Ms. Underwood is entitled to LTD benefits from Defendant for any reason, she seeks an Order remanding her LTD claim and this case to LINA so it can review the claim again and render a determination consistent with the Order issued by the Court;

D.      For attorneys' fees and costs incurred as a result of prosecuting this suit pursuant to 29 U.S.C. §1132(g); and

E.      For such other and further relief as the Court deems just and proper.

DATED this 16th day of April, 2021.

SCOTT E. DAVIS. P.C.


By: /s/ Scott E. Davis
Scott E. Davis
Attorney for Plaintiff